# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL RODRIGUEZ, CHARISSE FERNANDEZ, | Case No. 1:10-CV-01370-LJO-MJS |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT. |
| v. | Jury Trial June 9, 2015 |
| CITY OF MODESTO, A MUNICIPAL CORPORATION; RON CLOWARD, LIEUTENANT; JOHN BUEHLER, SERGEANT; JAMES MURPHY, RONNY ZIYA, MARK FONTES, AND KALANI SOUZA, POLICE OFFICERS IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES; AND DOES 1-10, | (Doc. 63) |
| Defendants. | |

Plaintiffs bring the instant civil rights action against the City of Modesto and the arresting officers, alleging excessive force under 42 U.S.C. § 1983 and state law causes of action for civil rights violations and battery. Before the Court in the above-styled and numbered cause of action is the motion of Plaintiffs Miguel Rodriguez and Charisse Fernandez (collectively, "Plaintiffs") for Summary Judgment, filed January 22, 2015 (Doc. 63). Defendants filed their Opposition on February 26, 2015 (Doc. 75). The Court deems the matter appropriate for resolution without oral argument. *See* Local Rule 230(g). Having considered the record in this case, the parties' briefing, and the relevant law, the Court will deny Plaintiffs' motion. The Court finds that there are triable issues of fact as to whether the officers' actions were reasonable, and these triable issues impact whether the officers are entitled to qualified immunity. The factual findings will need to be determined by the trier of fact, then to be used to determine the legal issue.

1

# I.  BACKGROUND[1]

**FACTUAL ALLEGATIONS**

The following relevant facts come primarily from Plaintiffs' Second Amended Complaint ("SAC") (Doc. 40); the Yourke Declaration, Exhibit 1 (Doc. 65-1): Rodriguez's deposition ("Rod. Depo."), Exhibit 2 (Doc. 65-2): Fernandez's Deposition ("Fern. Depo."); Defendants' Statement of Undisputed Facts ("DSUF") (Doc. 83); the declarations of relevant officers (Officers Jon Buehler, Mark Fontes, Florencio Costales, Ronny Ziya) ("Buehler Decl.," "Fontes Decl.," "Costales Decl.," and "Ziya Decl.") (Docs. 78-81), and police consultant Don Cameron ("Cameron Decl.") (Doc. 82), as well as Video Evidence ("Video") (Docs. 70, 77).

**Undisputed Events Leading to Encounter Between Police and Plaintiffs**

This suit is an excessive force claim stemming from events in Modesto, California, when at approximately 1:00 a.m. on February 8, 2009, Modesto Police Department Officers Ziya, Costales, and Sprueill responded to a noise complaint and arrived at the home of Adrian Alizaga ("Alizaga") to investigate. SAC ¶ 14; Ziya Decl., ¶ 2; Costales Decl., ¶ 2; Ex. A at 14:14-18.  Plaintiffs Charisse Fernandez ("Fernandez"), Alizaga's then-girlfriend, and Miguel Rodriguez ("Rodriguez"), Alizaga's cousin, were among a group of people gathered at Alizaga's home for his birthday party. *Id.*  An officer knocked at the front door, and Alizaga opened the door and stepped outside. *Id.* Alizaga's dog ran out of the front door, towards the officers. *Id; Ziya Decl., ¶ 4; Mtn. at 4:17.  The officers ordered that the dog be put inside. DSUF, ¶ 6.  Subsequently, Fernandez complied and put the dog in the house. *Id.*  When Alizaga did not return inside the house, several of his guests stepped outside, including Rodriguez. *Id.*, ¶ 23.  Rodriguez saw two officers standing over Alizaga who was lying on the ground, handcuffed. *Id.* Plaintiffs could see that the police had arrested Alizaga. *Id.*, ¶ 5, 23.  When Rodriguez went outside to check on Alizaga, he heard a police officer yelling at them to go back inside the house. *Id.*, ¶ 24.  Rodriguez asked the police why Alizaga had been arrested. *Id.*, ¶ 25.

The Parties' accounts of the key facts are markedly different.

---

[1] The Court takes the factual background in part from the facts as alleged in Plaintiffs' Second Amended Complaint ("SAC") (Doc. 40), and the Court's December 9, 2013 Order (Doc. 46), unless otherwise noted.

***Plaintiffs' Account of Events Leading to Use of Force***

According to Plaintiffs, these events stem from Alizaga's thirtieth birthday party on February 7, 2009. Rod. Depo. at 13:15-23.  Rodriguez states that approximately thirty guests attended, arriving around 7 or 8 p.m., and that "a lot of my family were there," including his wife, mother, aunts, and cousins. *Id.* at 13:25; 14:22; 16:13-15.  By the time police arrived, the parents had come and gone, only a group of about ten people remained, and the music was off. *Id.* at 16:16-17:1; SAC. ¶ 14.  Of those approximately ten guests who remained, Rodriguez remembers the following were present: himself, his wife, Alizaga, Alizaga's girlfriend Plaintiff Charisse Fernandez, another cousin Eric, friends Roger and Dietrich Davenport, and Jeremy Aguilar. Rod. Depo. 18:20-19:2.  A next-door neighbor, Steve, had been at the party, but was not in the house at the time of the incident. *Id.* at 21:7-13.  Inside the house, the guests congregated in the front living room.  People had been drinking beer at the party over several hours, so "everybody was buzzed," but not drunk. *Id.* at 20:9-25.  Rodriguez described the house as follows.  The front room is a living room with a window overlooking the front porch, facing the front street-side of the house. *Id.* 17:19-18:10.  The front door is in or near the living room and opens to a front porch, the dimensions of which are approximately six to eight feet wide and three feet deep. *Id.*at 23:5-16.  The front porch overlooks a fenced-in front lawn, the perimeter of which is a street-facing picket fence with a center gate, and the side fence, perhaps chain link or picket, is on the property line between the neighbors' houses. *Id.* at 23:17-24:1.  There are steps from the front yard up to the porch and the front door. *See generally* Video.  The distance from the front gate to the porch is approximately twenty feet. Rod. Depo. at 27:3.

Rodriguez was sitting in the front room on the couch from which he could see the front door when he heard a knock at the door. *Id.* 17:19-25; 19:4-6, 14-22.  He continued to talk on the couch, but noticed that his cousin Alizaga went to the door and opened it, but Rodriguez could not see who was at the door. *Id.* 19:10-24.  The front window's blinds were turned at an angle where people inside could not see out. *Id.* 18:5-10.  When Alizaga went to the door, he said, "watch him, watch him," apparently referring to his dog, a German Shepherd mix. *Id.* 20:2-5; 89: 2-10.  Alizaga went outside, the dog ran out, and Alizaga closed the door behind him. *Id.* at 21:16-20.  Rodriguez saw

Alizaga at the door, assumed a neighbor or another guest was at the door, and he remained on the couch talking in the living room. *Id.* 20:2-8.  At the time, Rodriguez had a prescription card for cannabis and at some point that night prior to the incident had smoked marijuana. *Id.* at 21:1-6.

Rodriguez noticed that Alizaga did not return for what "felt like a really long time." *Id.* at 22:8-14.  Because he wondered where Alizaga had gone, he went to the front door with Charisse Fernandez behind him. *Id.*  While together with the group in the small living room, Rodriguez opened the front door and "everybody" was "all kind of around each other" at the door. *Id.* at 22:20-22.  They saw two officers standing over Alizaga, who was face-down on the lawn inside of the front gate, his feet almost touching the front fence and his head pointed at the house. *Id.* 22:24-23:1; 24:2-17.  When Rodriguez opened the door, officers started yelling and "telling us to go back in the house." *Id.* at 25:1-2; SAC ¶ 15.  Rodriguez saw at least one police car on the street. *Id.* at 25:20-21.  While Alizaga was prone on the front lawn, Rodriguez saw officers bend over Alizaga and put handcuffs on him. *Id.* at 25:8-11.

Rodriguez concedes that he went out to the front lawn in an attempt to find out from police what was going on and why Alizaga had been arrested. SAC ¶ 15; DSUF ¶ 25.  He approached police and came halfway across the front law to within approximately eight to ten feet of the officers. Rod. Depo. at 26:18-22; 27:10.  Rodriguez asked the officers what was going on. *Id.* 26:15-22.  While asking questions, Rodriguez used an "upset, firm but not yelling voice, an articulate voice to let them know that they're talking to someone that has a brain, just interested in why his family is being arrested." *Id.* at 28:25-29:3.  While doing so, he was standing up and had his hands behind his back to show he was not a threat. *Id.* at 27:10-13; 28:21-22.  He was prepared to go to jail if necessary, and kept asking officers what was going on and why they were arresting Alizaga. *Id.* 28:13-14.  Rodriguez puts Fernandez outside with him at this point, slightly behind him to the left. *Id.* at 27:20-24.  Other party guests had come out of the house and were on the porch. *Id.* at 32:12-14.  From the front yard, Alizaga was yelling obscenities at officers, but no one else was. *Id.* 33:3-9.  From the porch, some people were asking officers what was going on and why was Alizaga being arrested. *Id.* 32: 15-23.  Someone on the porch yelled something like, "that's fucked up." *Id.* 33:13-19.

Officers refused to respond to Rodriguez's questions or give any explanation for Alizaga's arrest, and again ordered them to get inside the house. *Id.*at 28:9-11.  In response to Rodriguez's continued questions, an officer standing about 7-10 feet away pulled out his Taser, "and told me he was going to shoot me," and "basically told me to shut up and go back in the house." *Id.* at 29:21-30:1-2.  Rodriguez told the officer to shoot if he liked, but that he had no reason to do it because Rodriguez was not a threat to them, he was just asking why they were arresting his cousin. *Id.* 30:5-8.  Rodriguez did not threaten or advance on the officers in any way. *Id.*  He repeated to officers "I am of no threat to you. My hands are behind my back. I just want to know what's going on." *Id.* at 29:12-14.  The officer reholstered his Taser and did not use it at that time. *Id.* 35:9-14.  The officer reholstered his Taser about 30 seconds to a minute before the other officers arrived. *Id.*

Rodriguez concedes that he still did not go inside because he feared for Alizaga's safety if he left him alone with officers. *Id.* 30:10-17.  Rodriguez anticipated that the police might arrest him for refusing to go back inside but he felt he had to keep an eye on Alizaga. *Id.* 35:14-36:2.  In total, he estimates that he had been speaking to officers on the front lawn for two to three minutes when he saw numerous additional police cars arrive, pulling up to the house, and it "seemed like the whole police force." *Id.* 28:15-16; 30:18-31:7.  He observed approximately eight additional police officers arrive, maybe more. *Id.* 31:10-12.

Realizing the additional officers' imminent arrival, Rodriguez's friend Roger Davenport urged him to come inside. *Id.* 31:16-21.  Rodriguez refused his friends' pleas to move inside, telling them because "we didn't do anything wrong. I'm standing up for what I believe in. Nothing wrong happened here. I just want to know why he is being arrested." *Id.* 31:18-21.  The other individuals present were scared and while some remained on the porch, others went inside the house. *Id.* at 31:22-25; 32:8-9; *see* Video at minute 1:00-30.  Rodriguez contends that when additional officers arrived, he was the only party guest on the front lawn. *Id.* at 31:24.  The newly arrived additional officers came through the front gate. *Id.* 33:21-24.  Two or three officers came straight to Rodriguez. *Id.* at 34:3-7.  In his deposition, Rodriguez stated:

> I basically knew [I would get arrested]. I saw how many officers were coming. So I put my hands behind my back, and I knew like at this point just arrest me because I'm not going to let my cousin go to jail by himself. So I put my hands

5

behind my back literally like this, like made it easy for them to just put the handcuffs on me. Take me away. Because I felt I knew that I would have to talk to someone higher up, and I would tell them that this was wrong and tell them my side of the story, but that never happened.

*Id.* at 35:17-36:2.  Rodriguez contends that he did not resist or fight, when officers approached he stood with his hands behind his back, watching officers approach him. Rod. Depo. 36:7-10; 39:21-25.  Officers said nothing as they approached him. *Id.*

Fernandez's account is largely the same, albeit with details specific to her experience. When the dog ran into the yard, police ordered Alizaga to put the dog back in the house or they would shoot it. Fern. Depo., 23:24-24:7.  Fernandez ran after the dog, got hold of it, and brought the dog inside the house where she secured it in a back bedroom. *Id.*  Despite the police's order to move back or go inside the house, Fernandez concedes that she did not stay inside, but came out with Rodriguez to see what had happened to her boyfriend, Alizaga. SAC ¶ 17.  At some point she returned inside where she told some guests that Alizaga had been arrested, but Rodriguez remained outside. Rod. Depo. at 18:11-20.  Then, along with some guests, Fernandez went on the front porch to see what was going on. *Id.*; Fern. Depo. 23:16-23.  Outside for at least a second time, Fernandez saw Alizaga on the ground, and she saw five or six officers standing around Alizaga and officers hitting Alizaga with batons. Fern. Depo. 23:16-23, 27:8-15.  From where she stood on the porch, *Id.* at 31:17-32:1, she also saw officers "beating" Rodriguez, who was on the ground, lying on his side and facing toward Fernandez. *Id.* at 27:24-28:24; 31:17-32:1.

### Defendant City of Modesto Officers' Account of Events Leading to Use of Force

According to Defendants, Officers Ziya, Costales, and Sprueill responded to a noise complaint in a neighborhood known to have a high crime rate. Ziya Decl., ¶ 2; Costales Decl., ¶ 2; Ex. A at 14:14-18.  After officers knocked on Alizaga's door, he quickly opened it and told his dog "sic 'em" and "go get 'em," and the German Shepherd came out of the door in a rush. Ziya Decl., ¶¶ 3-4; Ex. A at 11:17-21.  Alizaga followed the dog outside, towards the officers and yelled "get 'em" to the dog. Ziya Decl., ¶ 4.  The officers were fearful that they would be attacked by the dog and commanded Alizaga to get the dog back inside the residence. *Id.*; Costales Decl., ¶ 3.  Alizaga refused, became belligerent, yelling "fuck you guys" and similar comments. Ziya Decl., ¶ 5.

Ms. Fernandez followed Alizaga outside and also confronted the officers. *Id*.  Officer Sprueill escorted Alizaga from the front porch to separate him from Fernandez.  The officers explained to Alizaga that they were only there for a noise complaint, and tried to get him to calm down, but he continued to act aggressive and shout profane statements at the officers. *Id*., ¶ 6. Fernandez began to become belligerent, and Alizaga became more belligerent. *Id*., ¶ 7.  The officers gave Alizaga several warnings to calm down, and at that same time a number of males, of which Miguel Rodriguez was one, exited the house and began to swear and shout at the officers and challenge them to fight. *Id*.; Costales Decl., ¶ 5.  Alizaga attempted to break away from Officers Sprueill and Ziya, but the officers attempted to handcuff Alizaga and take him into custody for resisting lawful the officers' orders, causing the crowd of males to advance towards the officers. Ziya Decl., ¶ 8.

Alizaga struggled against the officers, and Officers Sprueill and Ziya took Alizaga to the ground to gain control over him. *Id*. According to the officers, the crowd was hostile, shouting at the officers and challenging them to fight, and that Rodriguez was one of the individuals who challenged the officers to fight. Ziya Decl., ¶¶ 9-10; Costales Decl., ¶¶ 5-6.

Fearing that the situation could soon be out of control, Officer Costales called for backup. While waiting for back up, Officers Ziya and Costales stood side-by-side, approximately 1-2 feet from the crowd, and waited for backup to arrive while Officer Sprueill gained control of Alizaga. Ziya Decl., ¶¶ 10-11.  The male subjects continued to act hostile and refused commands to go back into the residence. Ziya Decl. ¶¶ 9-10; Costales Decl. ¶ 8.  The officers were outnumbered, and a number of members of the crowd were larger-sized individuals. Ziya Decl. ¶ 10.  After a while, several male subjects went back into the house, while several subjects remained outside and continued to shout at and antagonize the officers. Costales Decl., ¶ 7.

**Phase One of Physical Encounter Between Rodriguez and Officers**

***Rodriguez's Account***

Two or three of the additional officers marched straight to Rodriguez as soon as they arrived. Rod. Depo. at 34:3-7.  Rodriguez anticipated they were coming to arrest him and as he stood on the lawn, he presented himself to them by turning his back and putting his hands behind

his back. *Id.* at 35:17-19; 36:16-20.  Officers said nothing as they approached. *Id.* at 36:3-5.

Without any warning, one of the approaching officers, Officer Fontes, shot Rodriguez in the back

with a Taser. *Id.* at 36:7-13.  The Taser barbs went in Rodriguez's back. *Id.* at 36:25; *see* Doc. 69,

Nos. 4-20.  Officer Fontes was not the same officer who initially arrived on the scene and had

reholstered his Taser. *Id.* at 37:12; 38:11-14.  Rodriguez immediately fell to the ground. *Id.* at 40:1.

About the Taser strike, Rodriguez reported:

> When I got tased, my view changed from what was happening at eye level to now
> floor level. I instantly fell on the floor, so when you're being tased, forget about
> remembering anything at that point. It was just the feeling of being tased.

*Id.* at 39:11-15.

### Officers' Account

According to Defendants, officers ordered Rodriguez to stop walking in the front yard, and

in response Rodriguez became profane and belligerent. In response, Officer Costales unholstered

his Taser and pointed it at Rodriguez, who told Officer Costales to go ahead and shoot him.

Costales Decl., ¶ 6.  Additional officers arrived who also repeatedly told the crowd, which included

Rodriguez, to go back inside the house, but Rodriguez and Fernandez remained noncompliant and

were combative. Ziya Decl., ¶ 12; Costales Decl., ¶¶ 8-9.

The officers did not know how many people were in the house, whether there were weapons

in the house, whether the individuals in the front of the house – including Rodriguez and Fernandez

– were armed, or whether the dark areas on the sides of the house concealed persons who would

attack the officers. Ziya Decl., ¶ 19; Costales Decl., ¶ 13; Buehler Decl., ¶ 10; Fontes Decl., ¶ 11.

According to the officers, after having had a German Shepard "sic'ed on them," and not knowing if

anyone else from the party might attempt to attack the officers, it was essential that the officers

quickly gain control of the scene by detaining any individuals who were refusing to comply with

their lawful commands. *Id.*; Cameron Decl.; Ex. A at p. 4.

The officers specifically ordered Rodriguez to get on the ground and cease his aggressive

behavior.  Rodriguez refused and Officer Fontes told him that he was under arrest. Fontes Decl., ¶

4; Ziya Decl., ¶ 13.  Officer Fontes then attempted to grab Rodriguez' left hand to place it behind

his back and handcuff him, but Rodriguez spun away. Fontes Decl., ¶ 4.  Officer Ziya then

attempted a leg sweep takedown, which Rodriguez resisted, and Officer Fontes was ultimately able to successfully take Rodriguez to the ground onto his stomach. Fontes Decl., ¶ 5; Ziya Decl., ¶ 13.

Once on the ground on his stomach, Rodriguez held his arms firmly under his body and would not allow himself to be handcuffed. Ziya Decl., ¶ 14.  Officers had not searched Rodriguez for weapons. Fontes Decl., ¶ 8; Ziya Decl., ¶ 18.  Based on their experience and training, the officers understood that knives, guns, and other dangerous items can be concealed in the waistband of pants – the location where Rodriguez was keeping his hands, despite the officers' orders and physical attempts to place him in handcuffs. *Id.*

After Rodriguez was on the ground from the take-down, he continued to pull away from the officers, got into a crawling position, and began crawling away from the officers towards the house. Fontes Decl., ¶ 5.  At this point, due to this continued resistance, Officer Fontes first deployed his Taser in "probe" mode (which consists of two darts attached to electric wires) on Rodriguez. *Id.*  A verbal warning prior to deploying the Taser was not feasible because the officers did not have control of Rodriguez' hands, he was continuing to resist arrest, and the delay involved in giving a warning could have compromised the safety of the officers or others. *Id.*  After Officer Fontes tased Rodriguez, Rodriguez continued to pull away, breaking one of the connections on the Taser thus making it ineffective. *Id.*, ¶ 6.

**<u>Phase Two of Encounter Between Rodriguez and Officers: Rodriguez on the Ground</u>**

*Rodriguez's Account*

After the first Taser application, as Rodriguez fell, he fell forward and his hands were in front of him. *Id.* at 42:14.  When he landed, he was face down with his hands underneath his chest. *Id.* at 42:10-14.  Rodriguez contends:

> I don't know what he was doing exactly on my back. Because I'm like – I couldn't feel the batons – you could kind of feel it hitting but you can't feel the pain because when you're getting tased, it's like a locking feeling that's like – it takes over all your sensory. So you can feel nudges on you, but you can't feel the pain because you're being tased. It takes over everything. It's just like a locking feeling.

*Id.* at 44:18-45:1.

Officer Fontes used the Taser on Rodriguez approximately three more times and continued shooting him as he lay on the ground, face down, as other officers started striking him with batons. *Id.* at 40:1-25. The officer who tased Rodriguez was on top of him. *Id.* at 44:15-16. As he was shot with the Taser, Rodriguez was struck with a club repeatedly, all about his body. *Id.* at 59:1-12. He did not feel anyone pull on his arms or try to put on handcuffs. *Id.* at 45:17-25. About the baton strikes, Rodriguez stated that he was hit, "all over. It felt like everywhere. My legs, up and down, my whole complete body," and although he could not count the number of times, at least ten times. *Id.* at 40:5-6; 41:9-10. Officer Ziya was the officer who struck Rodriguez with a baton while he lay on the ground. *See* Yourke Exh. 4, Police Incident Report by Officer Ziya; *see* Ziya Decl (Doc. 81). Throughout the encounter, Rodriguez remained on the ground, face down, and incapacitated due to after-effects of the Taser use. SAC ¶ 15; Rod. Depo. at 44:18-45:1.

Nearly or actually overlapping with other uses of force, Officer Murphy deployed his canine against Rodriguez. SAC ¶ 15. After officers repeatedly used a Taser on Rodriguez and beat him with a baton, Officer Murphy ordered a police dog to attack Rodriguez as he remained lying on the ground, face down; the dog bit Rodriguez approximately four times. Rod. Depo. at 46:1-25; *see* Yourke Exh. 5, Police Incident Report by Officer Murphy. Rodriguez alleges:

> … they just kept hitting me, and then they released a dog on me. Like first they bring a dog after that. I'm electrocuted, I'm shocked, I'm getting beat, and then they like put the dog on me after that. So now the dog is just mauling my leg.

*Id.* at 45:25-46:5. Rodriguez further contends that the dog bit him:

> At least four times. At this point [officers] stopped tasing me and they stopped hitting me because they're able to relax now. The dog is biting me. Like I'm not getting tased anymore, so I have my mobility back again. I'm not going to let the dog eat my leg literally what he was doing. So I remember like trying to kick the dog off, not kick the dog, but trying to shake my pant leg and my leg out of his mouth. And then by this time it's just like – they keep – they're yelling the whole time. Stop resisting. Stop resisting. And I'm, well, stop doing everything you're doing to me. So I basically rolled over again and get back in this position [putting his hands behind his back], and that's when they handcuffed me.

*Id.* at 46:13-47:4. The dog bit Rodriguez on the right lower leg, causing deep wounds. SAC ¶ 15; Doc. 69, Exh. Nos. 4-20. Rodriguez described the duration of the physical encounter with the

officers seeming "like an eternity," but that it probably lasted about "one minute." Rod. Depo. at 47:9-11.  Rodriguez alleges he was wearing a t-shirt and jeans, was "clearly unarmed" and that he "did not offer any physical resistance to the police at all, even after they used force against him." *Id.*  According to Rodriguez, police handcuffed him and escorted him to a nearby patrol car. *Id.*

### *Officers' Account*

After the first application of the Taser in "probe" mode, Officer Fontes changed his Taser into "drive stun" mode. *Id.*, ¶ 7.  According to Defendants, "drive stun" mode is less effective, it requires direct contact with an individual, and is used for pain compliance. *Id.*, ¶ 7.  Officer Fontes shouted to Rodriguez that he needed to put his hands behind his back, and at the same time applied the Taser in "drive stun" mode to Rodriguez' back, to no apparent effect. *Id.*  Rodriguez still did not comply. *Id.*

Officer Fontes applied another cycle of the Taser in "drive stun" mode to Rodriguez' back and he continued to refuse to comply. *Id.*  Defendants note that Rodriguez admits that while this was happening he was face down on the ground and that the officers yelled to him to stop resisting arrest. Opposition (Doc. 75) (citing Pls. Mtn. at 5:22-24).

Because officers believed that the Taser had been ineffective, Officer Ziya deployed his "asp" collapsible baton and showed it to Rodriguez in an attempt to gain his compliance. Ziya Decl., ¶ 15; Fontes Decl., ¶ 9.  Officer Ziya ordered Rodriguez to take his hands from underneath him several times but he would not comply. *Id.*  Officer Ziya then struck Rodriguez on the left arm, but Rodriguez continued to refuse to comply. *Id.*  During this struggle, and while Officer Ziya deployed his baton, officers believed that Rodriguez did not display any indication of being under the influence of the Taser because he acted and spoke as if the Taser had no effect. Ziya Decl., ¶ 16. Even after being tased and then struck with the baton, Rodriguez still kept his hands underneath him, out of view of the officers and refused to comply with their commands so that they could place him under arrest. *Id.*, ¶¶ 15-17.

Officer Murphy then deployed his K9 to bite the lower extremity of Rodriguez, in an attempt to gain control over him because officers believed that the Taser and baton had been ineffective. Fontes Decl., ¶ 10. The K9 bites ultimately proved successful and Rodriguez allowed

the officers control of his hands, which the officers placed in handcuffs. *Id.*  According to

Defendants, all of the force used by the officers occurred in a matter of seconds.  No officers

applied any force to Rodriguez after he was handcuffed.

### **Encounter Between Fernandez and Officers**

#### *Fernandez's Account*

After she saw officers "beating" Alizaga and Rodriguez, and while standing on the porch,

Fernandez screamed at police, "Stop! What are you doing?!" *Id.* at 31:17-32:1.  According to

Fernandez, while she was still on the porch, Buehler grabbed her by the hair and threw her to the

ground without warning. Fern. Depo. at 32:4-8; Yourke Decl., Ex. 1 (Doc. 66-1); Video at minute

1:28.  When she fell to the ground, she ended up on her belly. *Id.* at 33:19-34:10.  While she was on

the ground, Officer Souza held a police dog to her head and ordered her not to move or the dog

would bite her. *Id.* at 34:11-25; SAC ¶ 17.  The dog was straining at the leash and lunging and

barking aggressively at Fernandez, causing her to scream loudly in terror for her life. SAC. ¶ 17.

Officer Buehler handcuffed her while she was face down on the grass. *Id.*  While she was

screaming and lying facedown on the lawn in handcuffs, another officer (unknown to Plaintiffs and

referred to as Officer Doe Defendant No. 1), approached her from behind and struck her about the

legs and left arm several times with his baton, causing bruising. *Id.*; Fern. Depo. 36:17-38:10;

Video at minute 1:40-45.  About a minute after she was thrown to the ground, police picked her up

from the front lawn where she lay facedown and placed her in the police car. Fern. Depo. At 35:23-

36:13.

Together, Plaintiffs allege that Defendant Lieutenant Cloward, the ranking officer on the

scene, observed the police conduct described above and did nothing to prevent it, stop it, or protect

the Plaintiffs. *Id.*

#### *Officers' Account*

While the officers were attempting to get Rodriguez on the ground, Defendants contend that

Fernandez jumped off the front porch, screaming and yelling, and inserted herself between Officer

Fontes and Rodriguez. Buehler Decl., ¶ 5; Costales Decl., ¶ 9.  It appeared to Sergeant Buehler and

Officer Costales that she was trying to push Officer Fontes away and to grab or "lynch" Rodriguez away and back towards the house. Buehler Decl., ¶ 6; Costales Decl., ¶ 9.

Officer Buehler concedes he grabbed Fernandez by the hair for a hair-pull take-down. DSUF ¶ 14.  Buehler contends that before he did so, Fernandez jumped off the porch, screaming and yelling, and inserted herself between Officer Fontes and Rodriguez. Buehler Decl., ¶ 6; Costales Decl., ¶ 9.  As Fernandez was taken to the ground by Sergeant Buehler, she continued to scream and yell profanities at the officers. While on the ground, she continued to yell, refused orders to remain still and tried to get up. Costales Decl., ¶ 10.  Officer Costales approached Fernandez as she was trying to get up, and, to prevent her from doing so, he placed his right knee on her back and grabbed her arms, and was then able to place her in handcuffs. *Id.*, ¶ 11.  He then placed her in the back seat of his patrol car. She did not complain to him of any injuries or being struck with a baton. *Id.*

According to Defendants, of the two officers involved in Fernandez's take-down and arrest, Sergeant Buehler and Officer Costales, neither struck Fernandez with a baton nor did they see any other officer strike Fernandez with a baton. Buehler Decl., ¶ 8; Costales Decl., ¶ 12.

### **Additional Undisputed Facts**

Despite the parties' differing accounts, Rodriguez and Fernandez allege that they never struck any of the police officers and police accounts make no allegations that they did. *See generally* Doc. 40; Def. Opp., Doc. 75.  Also, officers do not allege that Alizaga's dog was outside during the physical encounters between the officers and Rodriguez and Fernandez.

Defendants generally dispute Rodriguez's account, but do not dispute that post-arrest, police took Rodriguez to the local hospital for medical clearance and from there to the jail. SAC ¶ 16.  *Id.* He was released from jail the following morning at around 1:00 a.m., with a citation for "delaying, obstructing or resisting" the police, a misdemeanor under California Penal Code section 148(a) *Id.*

It is undisputed that Police held a police dog near Fernandez's head and ordered her not to move, or the dog would bite her. DSUF ¶ 17.  Defendants generally dispute Fernandez's account, but do not dispute that the police placed her in the back of a patrol car and transported her to a local

hospital for medical clearance where her injuries were noted. *Id.* She was then taken to the jail where she was booked on misdemeanor charges of violating Penal Code section 148(a). *Id.*

The Parties agree that on February 10, 2009, a misdemeanor criminal complaint was filed against Rodriguez and Fernandez in the Superior Court of Stanislaus County, in which each was charged with one misdemeanor count of violating California Penal Code § 148(a). Doc. 42, Ex. A. 2.[2]  Ultimately, Rodriguez and Fernandez each entered pleas of nolo contendere to the misdemeanor charge of resisting arrest. Doc. 42-2, 42-3, Exs. B & C.

***Video Account and Photographic Evidence***

Plaintiffs and Defendants submitted a video recorded during the incident by a female individual who, from the perspective of the video, was standing on the right side of the lit porch looking out into the dark front yard. Pls.' Lodged Exhibit (Doc. 70), Defs. Lodged Exhibit (Doc. 77).  Defendants object to the video provided by Plaintiffs (Doc. 70) for lack of authentication. Defendants acknowledge, however, that Plaintiffs previously produced the video to Defendants in discovery and that Defendants presume that the video lodged with the Court is identical to that produced in discovery.  In an abundance of caution, Defendants supplied the Court with a copy of the video they received from Plaintiffs as Exhibit E to the declaration of Kevin McLaughlin.  The parties' copies of the video appear to be the same, but due to Defendants' objection to the authentication of Plaintiffs' submitted copy, all references herein are made to the video submitted by Defendants.

Apparently taken with a cell phone, the video is in color, approximately three minutes and thirty seconds in duration, and is taken entirely from the perspective of someone standing on the right side of the house's front porch, looking out to the front yard of the house.  During the first thirty to forty seconds, a police officer can be seen to the left of the viewer, standing near the front door and talking to a man in a striped shirt on the left side of the porch, next to the door.  The porch is well-lit, and because the incident occurred at night, the view beyond the porch, although dark, is intermittently lit from flashlights, street lights, and police-car lights, and the viewer may see better

---

[2] The Court may take judicial notice of the misdemeanor complaint and the minute orders reflecting Plaintiffs' pleas of nolo contendere, Doc. 42, Exs. A-C, as they are readily attainable court records. Fed. R. Evid. 201; *United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004).

during these periods of occasional additional lights on the front yard.  During the first minute, women's voices make various comments such as, "what's going on?"  From the direction of the front yard, several male voices repeat "in the house!" and "back up!"  Soon after, a woman near the camera source comments, "they just want Charisse to shut the door."  Another woman's voice can be heard in a conversational tone, and two women seem to be speaking near the camera.  Then two women approach the front steps, walk up the steps, and go in the front door of the house.  At minute 1:05, a woman says, "Charisse, stay in the house you can't do nothing!"  At minute 1:10, lights from police cars can be seen coming down the street and pulling up to the house.  A woman's voice says, "look at all the police!"  At minute 1:14, the camera pans to the left side of the porch where the man in the striped shirt is standing and appears to be turning from a position facing the wall with his back to the officer, with the officer's hand on the man's back.  As the man slowly turns away from the wall, the officer's hand is still on his back, and both the officer and the man turn forward to look out to the street.  By minute 1:15, the man has turned fully forward, his back to the house, arms at his side, and both the man and the officer are looking to the street where multiple police cars are approaching with lights and sirens.

At minute 1:25, in the center of the frame, an officer fast approaches the man and officer on the porch, does not appear to say anything but takes the man's elbow, pulls him off the porch and onto the front lawn into darkness beyond the camera's view.  At this point, several women can be heard screaming, the camera gets jostled and abruptly jerks up, looks to the ceiling, and is jostled up and down while unknown individuals move on the porch in front of, but not clearly depicted by, the camera.  Between 1:30 and 1:50 there are numerous and various shouts and screams, which are difficult to differentiate.  There are shouts "get on your stomach!" A man's voice says talking forcefully, but not yelling, "put your hands behind your back, Miss."  At minute 1:50-52 a man's voice twice says, "get on our stomach," and a woman's voice responds, "No, I didn't do anything!" and she repeats, screaming, "I didn't do anything!" At minute 2:07 a man's voice says "put your hands behind your back, Miss," and "hands behind your back. Now!" At minute 2:11, a woman's voice says "Help me!" and "you're hurting me!"  There are various voices yelling, and raised, overlapping voices come from the direction of the front lawn.  A dog is barking.  At minute 2:15, to

the left of the porch and at the bottom of the stairs, there is a clear picture of a man, unmoving and facedown on the lawn, ringed with police officers, although it is unclear how many.  At the end of the video, the woman apparently taking the video shouts out to the front yard, "Charisse!" and she yells out that she got it on video.

In support of his motion, Rodriguez submitted seventeen photographs taken the night of February 8, 2009, after his arrest. Declaration of Steven Yourke ("Yourk Decl."), Exs. 4-20. The photographs depict Rodriguez lying down, apparently in a hospital room, dressed in what appears to be a hospital gown, and the photographs focus primarily on his legs and back. The close-ups show numerous bleeding puncture wounds to the back of Rodriguez's legs, various claw-like scratches on his legs, multiple round burns or abrasions on his back and shoulders, and extensive bruising over his body.  Fernandez submitted three photographs taken at some point subsequent to the night in question. Yourke Decl., Exs. 1-3.  The photographs show several straight, light bruises across the back of Fernandez's legs.

Defendants dispute Plaintiffs' representation of the cell phone video provided by Plaintiffs. Pls.' Lodged Exhibit (Doc. 70).  In their Opposition, Defendants characterize the cell phone video, taken by a member of the crowd, as "dark," and argue that it does not contradict officer accounts of events because the video does not show any baton strike to Fernandez.  Although Defendants admit that the video *may* show an officer attempting to deliver a strike to Rodriguez with an unidentified object, they emphasize that the events are unclear.  The video appears to show, upon their close examination according to Defendants, that Fernandez, who they contend was in the bottom left-hand corner and out of view when the blow was allegedly struck, was not in a location where she could have been struck by the object. Pls.' Lodged Exhibit (Doc. 70).

According to Defense expert Don Cameron, a police practices expert witness for the past 35 years and a police physical skills and classroom instructor for the past 45 years, the use of a leg sweep take-down, a Taser in both "dart" and "drive stun" mode, the use of a baton, and use of a K9 on Rodriguez were reasonable uses of force and within commonly trained techniques for officers in similar circumstances. Cameron Decl., Ex. A at pp. 3-4.

//

**PROCEDURAL HISTORY**

Plaintiffs filed suit on July 29, 2010, followed by a First Amended Complaint ("FAC") on December 8, 2010.  Docs. 1 & 16.  A January 6, 2011 Order dismissed the FAC with prejudice, finding, among other things, that the federal claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). Doc. 19.  The Ninth Circuit reversed, remanding for further proceedings. *Rodriguez v. City of Modesto*, 2013 WL 3958459, --- Fed. Appx. --- (9th Cir. Aug. 2, 2013).

Subsequently, this Court ordered Plaintiffs to file a Second Amended Complaint ("SAC"), which they did on September 25, 2013 (Doc. 40).  In their SAC, Plaintiffs allege fifteen causes of action.  The thrust of all of Plaintiffs' claims is that Defendants' actions constitute excessive force which violated Plaintiffs' constitutional rights, and which resulted in Plaintiffs suffering damages.

The Parties' dispositive motion deadline was January 22, 2015.  *See* Scheduling Order (Doc. 53).  On January 22, 2105, Plaintiffs Rodriguez and Fernandez timely filed a Motion for Partial Summary Judgment as to Liability for Violation of Civil Rights and Battery (Doc. 63).  Defendants filed their Opposition on February 26, 2015 (Doc. 75), but did not file a cross-motion for summary judgment.  The matter is now ripe for review.

**LEGAL STANDARD**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.  The Court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).  A fact is "material" if its proof or disproof is essential to an element of a plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal citation omitted).

The moving party bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323. If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed. R. Civ. P. 56(c); *Liberty Lobby, Inc.*, 477 U.S. at 250.

### DISCUSSION

As detailed below, the parties' accounts of key events differ significantly, therefore genuine issues of material facts exist as to whether the police officer's use of force during and after the Plaintiffs' arrest was objectively reasonable. As some measure of fact-finding is required, summary judgment is not warranted. Other than for Officer Fontes's initial use of the Taser, Defendants fail to meet their burden to prove that they are entitled to qualified immunity as a matter of law.

## I. PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Section 1983 Claims

To succeed in asserting his Section 1983 claims, Rodriguez must demonstrate that the action (1) occurred "under color of state law," and (2) resulted in the deprivation of a constitutional or federal statutory right. *Leer v. Murphy,* 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted).

Here, the parties do not dispute that the officers acted under color of state law, but dispute whether Defendants violated Rodriguez's Fourth Amendment rights and whether the Officer Defendants are entitled to qualified immunity. As the moving party, Plaintiffs bear the initial burden on summary judgment of pointing out "an absence of evidence to support [Defendants'] case." *Celotex,* 477 U.S. at 325. The burden shifts to Defendants, however, to prove that they are entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir. 2005). Defendants also maintain that the actions are barred under *Heck*.[3] The Court proceeds first to resolve Plaintiffs' motion for summary judgment, then turns to Defendants' affirmative defenses.

---

[3] As the Ninth Circuit has remanded with instruction that these claims are not barred by *Heck*, which this Court's December 9, 2013 Order (Doc. 46) makes clear, the Court declines to relitigate this issue.

Plaintiffs assert that the Defendant Officers used excessive force, and therefore engaged in an unreasonable seizure in violation of the Fourth Amendment.  Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno,* 500 U.S. 248, 250 (1991) (citations omitted); *see also United States v. Chan-Jimenez,* 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen.").

The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them. *Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985).  Neither tackling nor punching a suspect to make an arrest necessarily constitutes excessive force. *Graham v. Connor,* 490 U.S. 386, 396 (1989) ("'Not every push or shove, even if it may seem unnecessary in the peace of the judge's chambers,' . . . violates the Fourth Amendment") (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)).  But "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002).  The question in all cases is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting" the arresting officers. *Graham,* 490 U.S. at 397 (internal quotation marks omitted).

In the eleventh cause of action, Rodriguez claims that by repeatedly tasing him and striking him with a baton, without  warning and nearly without pause, the Defendant Officers violated his Fourth Amendment rights.  Rodriguez argues that such force was unconstitutionally excessive under the circumstances because he was a nonviolent, passively resistant suspect in a minor, nonviolent crime.  In Plaintiffs' eighth cause of action, on the same basis, Rodriguez claims that Defendant Officer Murphy using a trained police K9 dog ("K9" or "police dog") to attack him after he was on the ground and surrounded by officers was constitutionally excessive force in violation of his Fourth Amendment rights.  Defendants counter that the officers' use of force was reasonable

given that, according to Defense witnesses, Rodriguez was willfully noncompliant, he posed a threat to officers, and officers believed it necessary to resolve the situation quickly.

Claims of excessive force are analyzed under an objective reasonableness standard. *Scott v. Harris,* 550 U.S. 372, 381 (2007). Determining whether a Fourth Amendment violation has occurred requires a "careful balancing" of the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Graham,* 490 U.S. at 396-97; *Price v. Sery,* 513 F.3d 962, 968 (9th Cir. 2008); *Miller v. Clark County,* 340 F.3d 959, 964 (9th Cir. 2003). This is a three-step analysis.

### 1. Nature and Quality of Intrusion

The first step of this analysis requires an assessment of the severity of the intrusion on the individual's Fourth Amendment rights by evaluating "the type and amount of force inflicted." *Miller,* 340 F.3d at 964; *Drummond ex rel. Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (9th Cir. 2003).

Here, Defendants describe using four types of force: (i) a Taser in "probe" mode, without warning; (ii) a Taser in "drive-stun" mode, without warning; (iii) baton strikes, with a visual warning but no verbal warning; and, (iv) a K9 attack, without warning. Although parties do not dispute that officers used "intermediate" force, nevertheless, the Ninth Circuit indicates that the Court's inquiry should begin with an assessment of "the quantum of force used." *Davis v. City of Las Vegas,* 478 F.3d 1048, 1055 (9th Cir. 2007). Such details provide the foundation of the analysis and must be set forth "because the factors articulated in *Graham,* and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure." *Id.* (internal quotation and citation omitted). In assessing the reasonableness of an officer's actions, "the availability of alternative methods of capturing or subduing a suspect may be a factor to consider." *See Chew v. Gates,* 27 F.3d 1432, 1441 n. 5 (9th Cir. 1994).

//

//

*Tasers*

There can be no dispute that courts in this circuit consider Tasers an "intermediate, significant level of force that must be justified by the governmental interest involved." *Bryan v. MacPherson*, 630 F.3d 805, 810, 826 (9th Cir. 2010) (internal quotations omitted) (collecting cases standing for the proposition that use of a Taser constitutes at least an intermediate, nonlethal level of significant force); *see, e.g., Oliver v. Fiorino,* 586 F.3d 898, 903 (11th Cir. 2009) (recognizing that the Taser is "designed to cause significant, uncontrollable muscle contractions"); *Orem v. Rephann,* 523 F.3d 442, 447-48 (4th Cir. 2008) (rejecting the contention that a Taser constitutes a minor or *de minimus* level of force); *Hickey v. Reeder,* 12 F.3d 754, 757 (8th Cir.1993) ("We find defendants' attempt, on appeal, to minimize the pain of being shot with a stun gun . . . to be completely baseless. The defendants' own testimony reveals that a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless."); *see also Bryan*, 630 F.3d at 810 (finding that Taser use "unquestionably seizes the victim in an abrupt and violent manner," and, "[a]ccordingly, the "nature and quality" of the intrusion into the interests of [the suspect] protected by the Fourth Amendment was quite severe.") (citing *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 663-65 (10th Cir. 2010) (concluding that the use of a Taser "against a non-violent misdemeanant who appeared to pose no threat and who was given no warning" was unconstitutional excessive force under *Graham,* for which the officer did not enjoy qualified immunity)).

*Baton Strikes*

"[B]aton blows are forms of force capable of inflicting significant pain and causing serious injury. As such, [an officer's use of a baton is] regarded as "intermediate force" that, while less severe than deadly force, nonetheless present[s] a significant intrusion upon an individual's liberty interests." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161-62 (9th Cir. 2011) (citing *Smith v. City of Hemet,* 394 F.3d 689, 701-02 (9th Cir. 2005)).

*Use of Police Dog to Subdue a Suspect*

Where police officers use a trained police dog, the level of force, whether intermediate or deadly force, is determined based upon the unique factual circumstances of the case. *Smith*, 394

F.3d at 702, 707 (finding excessive force in a case involving officer use of a trained police dog attack on suspect in passive noncompliance and nonviolent submission, characterizing use of police dog attack as "severe," "intermediate" force, and "the most severe force authorized short of deadly force"; also, finding that although case law did not yet exist with such findings, use of a police dog *could* constitute "deadly force" in certain circumstances, and leaving a level of force determination for district courts to decide).  Plaintiffs make no allegation that the force used was deadly force.  By all accounts, the force of the trained police dog used to arrest Rodriguez was "intermediate" and "severe," as it resulted in multiple puncture bites and wounds to his legs. *See, e.g., Chew*, 27 F.3d at 1441.

### 2.  Government interest

The next step in the analysis requires evaluation of the government's interests by assessing (i) the severity of the crime; (ii) whether the suspect posed an immediate threat to the officers' or public's safety; and (iii) whether the suspect was resisting arrest or attempting to escape. *Id.; Graham,* 490 U.S. at 396.

#### i.  *Severity of crime*

The parties agree that the incident in question relates to Rodriguez's arrest for a violation of California Civil Code section 148(a), a nonviolent misdemeanor.  As no severe crime was at issue, this cuts against the use of significant force. *See Young*, 655 F.3d at 1166 (crimes involved were non-violent misdemeanors committed in a manner which did not indicate that suspect posed threat to officers, and thus not sufficiently "severe" to justify the use of significant force); *Robinson v. Solano Cnty*., 278 F.3d 1007 (9th Cir. 2002) (finding apparently unarmed man suspected of shooting neighbor's dogs was misdemeanor suspect, insufficient to justify officers' action of drawing gun at close range and pointing it at suspect's head; concluding that suspect's earlier use of a weapon, that he clearly no longer carried, was still insufficient to justify the intrusion on his personal security, without more).

#### ii.  *Immediate threat to officers*

The parties dispute whether Rodriguez posed an immediate threat to officers.  Rodriguez contends that he started the conversation with officers showing them his hands behind his back, he

was "obviously not armed," "posed no threat to officers," was nonviolent and only passively noncompliant, did not threaten physical violence nor did he exhibit or resort to physical violence. After he was tased, he contends that he experienced after-effects of the Taser, was disoriented, was not willfully noncompliant, and made no efforts to resist. *See* SAC, Doc. 40.

Defendants argue that officer accounts show that, on the scene, officers had three reasons to believe that there was an immediate threat to officers. First, they argue that the level of force was necessary to serve their interest in quickly resolving an escalating situation that had a potential for violent confrontation on a larger scale. However, this is exactly the kind of speculative concern that cannot alone justify using a significant level of force. *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ("a desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury. There must be other significant circumstances that warrant the use of such a degree of force at the time it is used.").

Second, Defendants suggest that officers considered the situation an immediate threat because they did not know whether more people might come out of the house, and, if they did, whether they could be armed. This similarly speculative argument also does not rise to the level of particularized facts and fails for a similar reason: "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern. In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Id.* Defendants do not allege such contemporaneous knowledge.

Finally, Plaintiff contends that he was wearing a t-shirt and jeans, he was clearly unarmed, told officers as much, presented himself with his hands behind his back when they first approached, and he was no threat to officers when he collapsed on top of his hands after officers used the Taser on him by which he was incapacitated. However, Defendants argue that even after Officer Fontes had, by their count, used the Taser on Rodriguez approximately four times, Rodriguez still posed an immediate threat to officers because he had no observable reaction to the Taser and would not unfurl his hands from beneath him while he lay on the ground, officers could not see his hands, and

23

he *could* have had weapons hidden in his waistband.  On this basis, Defendants raise a genuine issue of material fact, because, based upon these facts, it is at least possible that a trier of fact could reasonably find that officers reasonably believed that Rodriguez posed an immediate threat to officer safety.  The Court must leave the credibility determination on this disputed material fact to the jury. *Id.*

### iii.      Resisting Arrest or Attempting to Escape

Rodriguez contends that at the beginning of his encounter with police, before they tased him, he had his hands behind his back indicating he was passively compliant and cooperating with arrest.  After being tased and while on the ground, Rodriguez maintains that he was surrounded by officers, under their control, was disoriented by the Taser hit, and was either incapable of compliance due to the effects of the multiple Taser strikes or pain, and was, if anything, merely passively resistant.  If he did move, he was not attempting to flee.

For their part, officers specifically state that Rodriguez resisted arrest by spinning away and not cooperating with the officers' continued attempts to handcuff him.  Moreover, Defendants argue, even once he was on the ground, Rodriguez attempted to flee by crawling towards the house.  Whether Rodriguez was indeed resisting arrest or attempting to escape constitutes a dispute of material facts, and is thus a matter for the jury to decide.

### iv.      Other Considerations

"[T]he giving of a warning or failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle,* 272 F.3d at 1284. "[W]arnings should be given, when feasible, if the use of force may result in serious injury." *Id.*  Police are also "required to consider '[w]hat other tactics if any were available' to effect the arrest." *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1204 (9th Cir. 2000) *cert. granted*, *judgment vacated on other grounds*, 534 U.S. 801 (2001) (quoting *Chew,* 27 F.3d at 1443).

It is undisputed that Officer Fontes gave no warning in advance of using the Taser at any point during the approximately four uses.  It is also undisputed that Officer Ziya gave no verbal warning prior to using his baton to strike Rodriguez.  Finally, it is undisputed that Officer Murphy gave no warnings prior to releasing the police dog.  The officers' testimony is that they did not have

time to warn Rodriguez before escalating the use of force because the incident happened in a matter of moments, however, they did have enough time to evaluate and decide that the pain-compliance methods they used were not working before they decided to use additional significant force. Taken together, this factor weighs in favor of Plaintiffs, but does not, on its own, justify a finding that the use of force was unlawful.

To effectuate the arrest, Officers testify that they attempted to use a leg sweep takedown on Rodriguez, but because he spun and crawled away they could not handcuff him at the time. Defendants argue that once officers got him to the ground, officers do not allege that they considered less significant force because the officers did not want to come within close proximity to Rodriguez based on a lack of information about whether he was armed. But this generalized rationale is insufficient to justify not considering less significant force. *See Deorle*, 272 F.3d at 1281. These speculative concerns do nothing to differentiate Rodriguez from any other member of the public who may or may not be armed, and such speculative concerns do not excuse officers from considering less intrusive means. Moreover, by officer accounts, at least two officers did come in close proximity to Rodriguez in order to use significant force: Fontes, in order to use the Taser in a mode which requires contact with Rodriguez's body; and, Ziya to strike Rodriguez with a baton, which requires being within the baton's length of the suspect. Even so, officers contend that Rodriguez continued to defy officers' orders to remove his hands from beneath him, and allow himself to be handcuffed until after Officer Murphy released the K9 and the dog bit him multiple times.

In sum, the Defendant Officers' argument is that they were justified in using such significant force, not that other less significant means were not available to them. "Objectively, however, there were clear, reasonable, and less intrusive alternatives." *Bryan*, 630 F.3d at 831. Officers concede that they outnumbered Rodriguez three-to-one and that numerous other officers were at the scene. The number of officers available changes "the tactical calculus" because multiple officers had myriad ways to resolve the situation "without the need for an intermediate level of force." *Id.* This finding does not contradict the principle that police officers need not employ the "least intrusive" degree of force possible. *See Gregory v. County of Maui,* 523 F.3d

1103, 1107 (9th Cir. 2008) (citing *Forrester v. City of San Diego*, 25 F.3d 804, 807-8 (9th Cir. 1994)).  However, the Court "merely recognize[s] the equally settled principle that officers must *consider* less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a *factor* to include in [the] analysis. *Bryan*, 630 F.3d at 831.

Because the Defendant Officers concede they gave no warning before any of their various uses of force, and apparently did not consider less intrusive means of effectuating Rodriguez's arrest, this factor weighs against Defendants in the *Graham* analysis, but cannot be dispositive at this stage.

### 3. Balancing Gravity of Intrusion: Intermediate Force Against Government's Need for Intrusion

Ultimately, the excessive force analysis requires balancing the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Santos v. Gates,* 287 F.3d 846, 854 (9th Cir. 2002); *Miller,* 340 F.3d at 964 (a court must "balance[s] the gravity of the intrusion on the individual against the government's need for that intrusion.").

In doing so, the Court observes significant differences in the parties' accounts.  In summary, Rodriguez argues that the officers' actions were a disproportionate response to the situation they faced.  He argues that officers' use of severe, intermediate force was objectively unreasonable because no severe crime was at issue and he: had told officers he was unarmed; was, indeed, unarmed; was perhaps belligerent but not violent; had not threatened violence or resorted to violence of any kind; was surrounded and outnumbered by several police officers; was on the ground and, once there, was under officer control; was crawling away in pain or under the neurological effects of the Taser, but not threatening officers or fleeing; and in this context the officers' use of force was unconstitutionally excessive.  Rodriguez argues that whatever the officers' need to subdue him, it did not rise to the level such that it required using such violent force.

In contrast, Defendants describe the late-night events on February 8, 2009, very differently. Officer accounts are that upon arrival at a residence in a high-crime area, officers were confronted

with a group of belligerent, confrontational people one of whom "sic'ed" a dog on them. Afterwards, a group, including Rodriguez, was aggressively noncompliant with police requests for them to go inside the house. Officers contend that Rodriguez interfered with police action as they were arresting his cousin, and that he continued his belligerent, confrontational behavior throughout the encounter. After officers told him he was under arrest and attempted to handcuff him, Rodriguez spun away and did not cooperate. In response, officers admit using four "intermediate" levels of force, which, they contend, was necessary in circumstances where Rodriguez continued to resist arrest, posed an immediate threat to officers because he kept his hands underneath his body while lying on the ground when officers did not know whether he was armed, attempted to flee by crawling away from the officers towards the house, and continued to struggle against officers' efforts to handcuff him.

For the purposes of Plaintiffs' motion for summary judgment, all factual disputes must be resolved in favor of the nonmoving party. The Court finds that Defendants have raised genuine issues of material fact regarding their use of force because it is possible that a reasonable juror could find that the officers' use of force was objectively reasonable, even if the same could be said of a contrary finding. In such cases involving claims of excessive force, the Ninth Circuit has made plain that "[b]ecause such balancing nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," that summary judgment "should be granted sparingly." *Drummond,* 343 F.3d at 1056; *see also, Chew,* 27 F.3d at 1440 ("[T]he propriety of a particular use of force is generally an issue for the jury."). With that in mind and based on the record before it, the Court is not compelled to a conclusion that the force used by the police was either excessive or reasonable without some measure of fact-finding.

Because triable issues of material fact exist as to Plaintiffs' causes of action brought under section 1983 (Claims Eight and Eleven), summary judgment is inappropriate and the Court will deny Plaintiffs' motion as to these claims.

//

//

//

27

**B.  State Law Claims**

**1.  Rodriguez's State Law Claims**

Plaintiffs move for summary judgment on Rodriguez's state law claims (Claims Nine and Ten).  Defendants are correct that battery is the California law counterpart to a 42 U.S.C. § 1983 excessive force case. *See Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1179 (E.D. Cal. 2008) aff'd, 340 F. App'x 377 (9th Cir. 2009) (citing *Munoz v. City of Union City,* 120 Cal.App.4th 1077, 1102 n. 6 (2004); *Susag v. City of Lake Forest,* 94 Cal.App.4th 1401, 1412-13 (2002); *Edson v. City of Anaheim,* 63 Cal.App.4th 1269, 1274 (1998)).  As Plaintiffs' ninth and tenth causes of action are coextensive with Rodriguez's federal claims, the motion for summary judgment as to the battery claim fails for the same reason the motion fails as to the federal excessive force claim. *Young,* 655 F.3d at 1170 (holding that "the Fourth Amendment violation alleged by [plaintiff] also suffices to establish the breach of a duty of care under California law"); *Brown v. Ransweiler,* 171 Cal. App. 4th 516, 527 (2009) ("A state law battery claim is a counterpart to a federal claim of excessive use of force.  In both, a plaintiff must prove that the peace officer's use of force was unreasonable.").

As genuine issues of material facts remain concerning whether the officers' use of force against Rodriguez was reasonable, whether that force amounted to battery is a question for the jury. Accordingly, summary judgment is unwarranted as to Rodriguez's state law claims.

**2.  Fernandez's State Law Claims**

Although Plaintiffs do not discuss Fernandez's federal claims, they move for summary judgment on her state law claims as follows: a civil rights violation under California Civil Code 52.1(a) ("Bane Act") (Claim Six); and a state law claim for battery (Claim Seven).  Both claims are based on the officers' conduct after Fernandez alleges she submitted to and was under police control, lying face down in the front yard, where an officer struck her with a baton while another officer threatened her by holding a barking police dog close to her head.

Defendants concede that an officer held a trained police dog to Fernandez's head, but argue that Plaintiffs' summary judgment motion fails because genuine issues of material fact exist surrounding whether officers actually used a baton to strike Fernandez.  Defendants also emphasize that Plaintiffs have not pled any coercive activity and thus Plaintiffs' Bane Act claim necessarily

fails.  Plaintiffs respond that the officers' actions constitute unlawful activity and ask the Court to grant summary judgment in their favor.

### Claim Six: Civil Rights Violations under California Law

The Bane Act, codified in the California Civil Code, authorizes individual civil actions for damages and injunctive relief by individuals whose federal or state rights have been interfered with by threats, intimidation, or coercion. Cal. Civ. Code § 52.1(a) (proscribing interference "by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state ..."); *see also Jones v. Kmart Corp.*, 17 Cal. 4th 329, 338 (1998) (California Supreme Court equates "interferes" with "violates").

Defendants argue that a section 52.1 plaintiff must demonstrate that the constitutional violation "occurred and that the violation was accompanied by threats, intimidation or coercion within the meaning of the statute." *Barsamian v. City of Kingsburg*, 597 F.Supp.2d 1054, 1057 (E.D.Cal. 2009).  "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Austin B. v. Escondido Union School Dist.*, 149 Cal.App.4th 860, 883 (2007).

As pled in the SAC, Fernandez's claim states a Bane Act claim alleging that despite her submission to police control, not only did officers strike her with a baton, but they threatened her with violent acts of a police dog.  Section 52.1 "does not extend to all ordinary tort actions because its provisions are limited to threats, intimidation, or coercion that interferes with a constitutional or statutory right." *Venegas v. Cnty. of L.A.*, 32 Cal. 4th 820, 843 (2004).  However, this Court has found that if a plaintiff makes factual allegations showing a constitutional violation based on excessive force, she need not, in addition, introduce independent evidence showing threats, intimidation, or coercion. *See e.g. Akey v. Placer Cnty., Cal.*, No. 2:14-CV-02402-KJM, 2015 WL 1291436, at *10 (E.D. Cal. Mar. 20, 2015); *see also Johnson v. Shasta Cnty.*, No. 14-01338, 2015

WL 75245, at *13 (E.D. Cal. Jan. 6, 2015) ("'Where Fourth Amendment unreasonable seizure or excessive force claims are raised and intentional conduct is at issue, there is no need for a plaintiff to allege a showing of coercion independent from the coercion inherent in the seizure or use of force.'") (quoting *Dillman v. Tuolumne Cnty.*, No. 13-CV-00404-LJO, 2013 WL 1907379, at *21 (E.D. Cal. May 7, 2013)).

Considering Plaintiffs' factual allegations relative to the officers' use of force against Fernandez, the Court finds that Plaintiffs have pled sufficient facts to support an excessive force claim, but that parties dispute Fernandez's level of resistance during her arrest. Consequently, the Court concludes that genuine issues of material facts remain relevant to the sixth cause of action concerning whether the officers' use of force against Fernandez, if it happened, was reasonable. As resolution of the disputed facts calls for factual determinations, the Court is not compelled to resolve the matter on summary judgment.

### Claim Seven: Battery

The SAC's seventh cause of action is an allegation by Fernandez against the same officer that his use of a baton to strike her about the legs resulting in her pain and injury constitutes battery under California law. As explained above, in the context of a peace officer's use of force, "[a] state law battery claim is [the] counterpart to a federal claim of excessive use of force[,]" and similar standards apply. *Brown*, 171 Cal. App. 4th at 527 & n. 11 (2009); *see also Edson*, 63 Cal.App.4th at 1274 (applying standards for a federal excessive force claim under § 1983 to a state law battery claim).

Fernandez's battery claim hinges on whether the incident with the baton actually happened, a material fact which the parties dispute. As the basis of Fernandez's complaint is disputed, whether that disputed force would amount to battery is a question for the jury. Accordingly, the Court will deny the instant motion as to the sixth and seventh causes of action.

## II.   QUALIFIED IMMUNITY

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The

protection of qualified immunity applies regardless of whether the government official makes an error that is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation and citation omitted). "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Id.* at 245.

To determine if qualified immunity applies, the Court must ask (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Pearson*, 555 U.S. at 232). Thus, "[t]he threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003).

## A. Threshold Issue: Whether to Use Defendants' Facts, as Defendants Urge, or Defer to Plaintiffs' Facts as Precedent Prescribes

In summarizing their argument for qualified immunity, Defendants emphasize that, "[o]n these facts, <u>construed as they must be in the light most favorable to Officer Fontes</u>, qualified immunity applies, and the motion should be denied for this additional reason." Defendants provide no further argument about how they come to this standard, and do not move for summary judgment. *See* Def. Oppo. (Doc 75) (emphasis added).

Defendants are wrong in three ways. First, Defendants assert qualified immunity in the midst of their argument that the officers' actions do not constitute excessive force. This loose construction ignores that a qualified immunity analysis is separate and distinct from an excessive force analysis. *Saucier v. Katz*, 533 U.S. 194, 204 (2001). Having merged the two arguments, Defendants make a second mistake by operating under a summary judgment standard. Certainly the correct premise on summary judgment is that a court draws all reasonable factual inferences in favor of the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 255. Yet Defendants jump to a qualified immunity argument and incorrectly assume that because they are the nonmoving party to the summary judgment motion, the Court must also defer to their facts *in its qualified immunity analysis*. This argument hinges on using Defendants' facts – as Defendants emphasize the Court

must do – and, as a result, officers are entitled to qualified immunity.  As their argument goes, the officers are entitled to qualified immunity because – well, they say so.  Not only is deference to Defendants' facts wrong in a qualified immunity analysis, it is nonsensical and would lead to absurd results.  Excessive force claims would be subsumed in a court's qualified immunity analysis and, able to rely on their own facts every police officer would be entitled to qualified immunity; no plaintiff could defeat a qualified-immunity defense to a summary judgment motion, thus rendering the doctrine meaningless.

Defendants apparently conflate the standards for facts used relative to qualified immunity with those used for summary judgment.  It is beyond dispute that for the purposes of a qualified immunity analysis, the Court must use the *injured* party's facts. *Mueller v. Auker*, 576 F.3d 979, 1006 (9th Cir. 2009) ("The first step of *Saucier* asks whether, viewing the evidence <u>in the light most favorable to the allegedly injured party</u>, the record establishes a constitutional violation.") (emphasis added) (citing *Saucier*, 533 U.S. at 201).  In other words, "a court generally just adopts the version of the facts <u>set forth by the party challenging immunity</u>." *Id.* (emphasis added) (citing *Scott*, 550 U.S. at 381 n.8 (holding that the dispositive question in the first step of *Saucier*— whether those facts establish a constitutional violation—"is a pure question of law").

The Court concludes that it must proceed in a two-pronged qualified immunity analysis, considering the facts in the light most favorable to Plaintiffs, as the injured party. *See Saucier*, 533 U.S. at 201.

### B.  Qualified Immunity Analysis

Because qualified immunity is an affirmative defense, the defendant bears the burden of establishing entitlement to it. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant.").  The Court usually first considers whether the officers' conduct violated one or more of the Plaintiffs' constitutional rights. *See Saucier*, 533 U.S. at 201.  If the answer is no, the inquiry stops and the defense of qualified immunity applies. *Id.*  However, if the answer is yes, then the Court must determine whether the constitutional right was so clearly established that a reasonable officer would have understood that

his conduct violated that right. *See Robinson v. York,* 566 F.3d 817, 821 (9th Cir. 2009) (citing *Saucier,* 533 U.S. at 201-02) (finding that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). Even if an officer's conduct does violate the Constitution, "a reasonable but mistaken belief that his conduct was lawful would result in the grant of qualified immunity." *Wilkins,* 350 F.3d at 955.

### Phase One: Officer Fontes's Initial Use of Taser in "Probe" Mode

The Court proceeds in its analysis in the context of deference to Plaintiffs' facts, as it must. *Saucier,* 533 U.S. at 201; *Scott,* 550 U.S. at 381 n.8. In Phase One of the encounter, the facts specifically involve the initial interaction between Rodriguez and Officer Fontes. According to Rodriguez, as he stood on the lawn he saw several officers fast approaching him and, anticipating that they were coming to arrest him, he put his hands behind his back and turned to present his hands to the approaching officers. Then, without a warning, Officer Fontes tased Rodriguez, and the Taser barbs entered his back. As a result of being hit by the Taser, Rodriguez fell, landing facedown on the lawn with his hands beneath his chest, his body "locking" and incapacitated by the neurological effects of the Taser, as well as pain.

Relative to Phase One of the encounter between Rodriguez and police officers, the Court first addresses the second prong of *Saucier,* as it may be dispositive. *See Pearson,* 555 U.S. at 236 (court has discretion to consider the two factors in any order, as it deems appropriate).

Defendants aver that "it would not be clear to every reasonable official that the use of a taser in this situation would constitute excessive force because there is no evidence of Fontes's "plain incompetence" or a "knowing violation" of the law in the use of a taser." *See* Doc. 75; *see Ashcroft v. al-Kidd,* 131 S. Ct. 2074, 2083 (2011). Defendants rely on *Bryan* and *Mattos* to show that the law was insufficiently unclear at the time of the incident to put Officer Fontes on notice that his use of a Taser against Rodriguez was excessive. *See Bryan,* 630 F.3d at 826; *Mattos v. Agarano,* 661 F.3d 433, 452 (9th Cir. 2011) (resolving both *Brooks v. City of Seattle,* and *Mattos v. Agarano,* in which the Plaintiffs were tased during encounters with police officers; reversing the district court's denial of summary judgment on qualified immunity grounds on Brooks's and Mattos's

excessive force claims on the basis that relevant case law was not clearly established at the time of the incidents).

The Court agrees that case law was not sufficiently clearly established in February 2009 to put the Defendant Officer on notice that an officer, acting alone and absent the involvement of any other significant use of force, by using a Taser in dart mode on a noncompliant nonviolent misdemeanor suspect, would be considered unconstitutional. *See, e.g., Bryan,* 630 F.3d at 832-33 (holding that although the plaintiff alleged a constitutional violation based on officer's use of a Taser in dart mode, the only use of force at issue, defendant was entitled to qualified immunity because the law was not clearly established at the time of the conduct).  Other courts have found that *Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011), serves as the basis for finding clearly established case law relevant to Taser use in dart mode. *See, e.g., Kyles v. Baker*, No. 13-CV-04695-WHO, 2014 WL 5524256, at *14 (N.D. Cal. Oct. 31, 2014) (acknowledging that Ninth Circuit case law from 2011 was the basis for finding Taser use was clearly established).

Applying the *Graham* factors to the *Brooks* incident, the Ninth Circuit concluded that a reasonable juror could find excessive force where an officer used a Taser on a misdemeanor suspect because:

> [Plaintiff's] alleged offenses were minor. She did not pose an immediate threat to the safety of the officers or others. She actively resisted arrest insofar as she refused to get out of her car when instructed to do so and stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from her car. [Plaintiff] did not evade arrest by flight, and no other exigent circumstances existed at the time.

*Id.* at 445-46.  Despite finding that Brooks alleged a Fourth Amendment violation, the Court found that the officer was entitled to qualified immunity in these circumstances because, it reasoned, relevant case law on Tasers was not clearly established at the time of the incident in 2004. *Id.* Similarly, in *Mattos*, the Court concluded that a woman's incidental physical contact with an officer and her momentary resistance of her husband's arrest were minimal and did not rise to the level of active resistance, thus, her actions were insufficient to justify the use of significant force, such as a Taser in dart mode. *Id.* at 452.  In each case, *Brooks* (about a 2004 incident), *Mattos* (about a 2006 incident), and *Bryan* (about a 2005 incident), however, the Court concluded that the alleged

34

constitutional violation was not clearly established when the conduct occurred because, at the time, "there was no Supreme Court decision or decision of our court addressing" the use of a Taser in dart mode. *Mattos v. Agarano*, 661 F.3d 433, 452 (9th Cir. 2011) (citing *Bryan,* 630 F.3d at 833). This Court finds that, based on the conflicting case law which developed between 2006 and 2009, still prior to the contrary findings in *Mattos, Brooks*, and *Bryan*, a reasonable police officer could have reasonably believed that using a Taser, when used alone to subdue a noncompliant, belligerent suspect, comported with the Fourth Amendment, even if such a suspect was nonviolent, not fleeing, and merely a suspect in a minor crime.  *See, e.g., Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1179 (E.D. Cal. 2008) *aff'd,* 340 F. App'x 377 (9th Cir. 2009) (supporting Defendants' proposition); *but see Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1143 (W.D. Wash. 2007) *aff'd,* 301 F. App'x 704 (9th Cir. 2008) (affirming a district court's finding that an officer in similar circumstances was not entitled to qualified immunity for his third, fourth, and fifth uses of a Taser to subdue a suspect in a nonsevere crime).

Therefore, Officer Fontes could have reasonably believed that his Taser use comported with the Fourth Amendment because these conflicting cases similarly involve an individual officer's use of a Taser, neither combined with nor used in tandem with any other significant use of force.  In these circumstances, "the principles of qualified immunity shield an officer from personal liability." *See Pearson v. Callahan*, 555 U.S. 223, 244-45 (2009) ("[O]fficers are entitled to rely on existing lower court cases without facing personal liability for their actions.").  On that basis, Officer Fontes is entitled to qualified immunity for his initial use of the Taser in "probe" mode.

### Phase Two: Officers' Use, in Concert, of Intermediate Force

1.  First Prong of *Saucier*: Whether Conduct Violated Rodriguez's Fourth Amendment Rights

After the first Taser strike, during Phase Two of the encounter between police officers and Rodriguez, according to Rodriguez, he was on the ground surrounded by at least three officers, his body was "locked" from the effects of the Taser, he was not resisting arrest, he was nonviolent and nonthreatening, was obviously unarmed in his t-shirt and jeans, he did not flee from officers, and he

was a suspect in a misdemeanor.[4]  In this context, the officers' nearly or actually simultaneous actions deploying three Taser applications in "drive-stun" mode (Fontes), while striking him with a baton (Ziya), and releasing a K9 to attack him (Murphy), violated his Fourth Amendment right to be free from the application of nontrivial force as a passively resistant suspect in a minor, nonviolent crime. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (citing *Nelson*, 685 F.3d at 881 (same)); *Young*, 655 F.3d at 1167.  Thus, determining if the officers' conduct is violative of Fourth Amendment principles hinges on whether: (a) the force used was nontrivial; (b) Rodriguez was a suspect in a minor crime; and, (c) Rodriguez's conduct constitutes passive resistance.[5]

In the *Graham* analysis, *supra*, the Court has already determined the answer to the first two questions.  The three types of force the officers used against Rodriguez in Phase Two each constitute "intermediate force," and that, taken together, the force used by officers was significant.  Also, the parties agree that the underlying crime involved was a violation of California Civil Code section 148(a), a nonviolent misdemeanor, considered a minor crime.  The Court turns to whether, as a matter of law, Rodriguez's conduct constitutes passive resistance.

Like Rodriguez, the plaintiff-suspect in *Bryan v. MacPherson*, would not comply with an officer's command to retreat.  630 F.3d at 829-30.  Bryan refused to return to his vehicle after a traffic stop, but the Ninth Circuit found that such conduct did not rise to the level of active resistance, instead finding that such actions constituted noncompliant nonresistance, and that "such noncompliance does not constitute active resistance supporting a substantial use of force." *Id.*  The Court reasoned that it did not find Bryan's resistance "particularly bellicose," because "[s]houting gibberish and hitting one's quadriceps is certainly bizarre behavior, but such behavior is a far cry from actively struggling with an officer attempting to restrain and arrest an individual." *Bryan*, 630

---

[4] The Court defers to Plaintiffs' facts. *Saucier*, 533 U.S. at 201; *Scott*, 550 U.S. at 381 n.8.
[5] Whether a plaintiff-suspect's resistance was passive or active, as a matter of law, informs a court's second prong analysis under *Saucier*. *See e.g. Bryan*, 630 F.3d at 830 (citing *Forrester*, 25 F.3d at 810 (reasoning that qualified immunity analysis turned on finding that protestor's defying police orders constituted "passive resistance"); *see also Headwaters II*, 276 F.3d at 1130-31 (reasoning that qualified immunity analysis turned on finding that protestors who defied police commands only passively resisted).

F.3d at 30 (citing *Smith,* 394 F.3d at 703).  Considering the facts in the light most favorable to the plaintiff, the *Bryan* court concluded that although the suspect was noncompliant with police orders and behaving strangely, "his conduct does not constitute resistance at all." *Id.*

In *Smith v. City of Hemet*, the police officers similarly ordered the plaintiff-suspect to take his hands out of his pockets and place his hands behind his back. 394 F.3d at 703.  But Smith "continually ignored" officer commands to remove his hands from his pockets and to not re-enter his home. 394 F.3d at 703.  Although Smith defied police orders by keeping his hands in his pockets and going back in the house and even attempting to defy the orders a second time, the Court observed that he did not flee or attempt to run from officers, and noted that he was nonviolent, did not attack the officers, and his physical resistance lasted only for a brief time.  *Id.* Therefore, despite defying officers' orders and refusing to place his hands behind his back, the Court reasoned that, while Smith's conduct was "not perfectly passive," such conduct was minor and did not support a significant use of force. *Id.*

Similarly here, although Rodriguez did not comply with police orders to remove his hands from beneath him and he may not have been perfectly passive as he lay on the ground, he was nonviolent as he lay prone on the ground, officers do not allege that he attacked them, he did not run from police, and his physical resistance, if any, lasted only a brief time.  Therefore, like Smith, Rodriguez's conduct constitutes passive resistance.  In one way, Rodriguez's resistance is even less than Smith's, because, rather than an affirmative decision to disobey officers' commands, Rodriguez claims that his actions came as a result of the neurological effects of the Taser and/or instinctual reactions to pain stimulus.  To the extent Rodriguez physically resisted arrest by continually ignoring officers' commands to move his hands from beneath him, the Court concludes that, just like in *Smith*, these actions are minor, do not include a physical struggle, and do not rise to active resistance, as a matter of law. *Id.* at 703; *Nelson v. City of Davis,* 685 F.3d 867, 881 (9th Cir. 2012) (cases dating to before 2001 established that a passively resistant, nonviolent suspect's "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force.").  On that basis, and resolving factual disputes in favor of Plaintiffs for the purposes of qualified immunity, the Court

37

concludes that, if proven at trial, the force Defendant Officers used was excessive in violation of the Fourth Amendment.

This conclusion comports with analogous case law in this circuit.  Looking again to *Smith v. City of Hemet*, the Ninth Circuit found that a genuine issue of material fact remained whether multiple officers' numerous uses of force constituted "excessive force by spraying [the suspect] with pepper spray four times, slamming him down onto porch, dragging him off the porch face down, and ordering a canine to attack and bite him three times," despite the officers' speculative, though reasonable, on-the-scene concerns about a heightened probability of danger. 394 F.3d 689 (9th Cir. 2005).  The Ninth Circuit acknowledged that a heightened possibility of danger may exist in a domestic violence context, but noted that the officers operated under mere speculative beliefs about perceived possible danger, and despite that context, "the circumstances are not such [. . .] as to warrant the conclusion that [the suspect] was a particularly dangerous criminal or that his offense was especially egregious." *Id.* at 702.  And, taken together with plaintiff's evidence "from which a reasonable jury could conclude that the force used against him was excessive," the conduct at issue was violative of the suspect's Fourth Amendment rights. *Id.* at 702.

Similar to its decision in *Smith*, the Ninth Circuit found in *Blankenhorn v. City of Orange*, in 2007, that officers were not entitled to qualified immunity, reasoning that a triable issue existed as to whether the defendant officers used excessive force by "gang tackling" and punching a nonviolent misdemeanor suspect. 485 F.3d 463, 480-81 (9th Cir. 2007).  The Court concluded that officers were on notice of the "clear principle" that punching and "gang tackling" a passively resistant suspect in a minor crime would be considered excessive force, and thus violative of such a suspect's Fourth Amendment right to be free from nontrivial force. *Id.*

Defendants emphasize that officers were justified in using significant force because Rodriguez actively resisted officers' efforts to effectuate his arrest for a misdemeanor.  But even if the Court were to consider Rodriguez's conduct from the officer's subjective perspective, "this case would be closer to the passive resistance [court] confronted in *Forrester* and *Headwaters* or the minor resistance in *Smith,* than it would be to truly active resistance." *Bryan*, 630 F.3d at 830 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994) (finding that protestor's

"remaining seated, refusing to move, and refusing to bear weight" despite police orders to the contrary constituted "passive resistance"); *Headwaters Forest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130 (9th Cir. 2002), *as amended* (Jan. 30, 2002) ("*Headwaters II*") (finding that protestors, who were chained together with devices and refused to exit a building when ordered, passively resisted)).  In the instant action, as in *Bryan*, the only resistance the officers testify to was Rodriguez's failure to comply with their orders to move his hands from beneath him and his crawling away.  Officers do not allege that he struck them – or was violent at all – and do not allege that Rodriguez specifically threatened them with violence during Phase Two. *Id.*  In other words, even if Rodriguez's failure to move his hands was an affirmative act, or if he did crawl away on his hands and knees, this is exactly the kind of conduct the Ninth Circuit considers minor, passive resistance, which is insufficient justification for the use of significant force. *Smith*, 394 F.3d at 703.

Facts in the instant case are sufficiently similar to *Smith* and *Blankenhorn* that this Court finds substantial support for the proposition that the alleged force used on a passively resisting suspect would be considered unconstitutionally excessive force. *See e.g. LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (finding that use of significant force "may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon . . . constitutes excessive force."); *see also Kyles v. Baker*, No. 13-CV-04695-WHO, 2014 WL 5524256, at *13 (N.D. Cal. Oct. 31, 2014) (under *Blankenhorn*, officers' alleged acts, including forcing arrestee to ground, striking him with flashlight, hitting him with other heavy object, and deploying stun gun, if proven, constituted violations of arrestee's clearly established Fourth Amendment rights, and thus officers were not entitled to qualified immunity in arrestee's excessive force action, where arrestee, although initially verbally combative, was allegedly unarmed, as well as calm and compliant, at time alleged force was applied).

Accordingly, the Court concludes that, if the facts as alleged are proven at trial, a reasonable jury could conclude that the officers' conduct constitutes violations of Rodriguez's clearly established Fourth Amendment right to be free from the application of nontrivial force as a passively resistant suspect in a minor crime.

39

2.   Second Prong of *Saucier*: Whether Right Was Clearly Established

Having determined that Rodriguez has alleged a Fourth Amendment violation, the Court must next determine whether Plaintiffs' right to be free from excessive force was clearly established on February 8, 2009. *Saucier,* 533 U.S. at 201 ("[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established" at the time of the arrest.).  Defendants are correct that the question is whether, at the time the officers used intermediate force, was the constitutional violation described above "'sufficiently clear' that every 'reasonable official would have understood that what he [was] doing violate[d] that right[?]'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

Defendants fail to address in a meaningful way the full scope of the cumulative quantum of force the officers used against Rodriguez.  Defendants obliquely suggest that the Taser-only cases support the proposition that the Defendant Officers involved in the overlapping use of significant force in Phase Two are entitled to qualified immunity.  Certainly, *Mattos*, *Brooks*, and *Bryan* inform the Court's Taser analysis, *supra*. But these cases involve only an individual officer's use of a single type of force, a Taser, used in isolation.  Yet there are critical factual distinctions between the instant case and *Mattos*, *Brooks*, and *Bryan*, which easily distinguish them on the facts because, in contrast to a single type of force used in isolation, here in Phase Two, multiple officers acting in tandem used three types of force, and did so nearly or actually simultaneously.  In relation to the totality of the conduct in Phase Two, Defendants' reliance on these cases is misplaced.

Said various ways in numerous cases, the right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established <u>prior to 2008</u>. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (citing *Nelson,* 685 F.3d at 881 (same)).  While the analogous cases, *infra*, are not factually identical, they need not be. *Young*, 655 F.3d at 1167 ("officials can still be on notice that their conduct violates established law even in novel factual circumstances," and rejecting that "a requirement that previous cases be 'fundamentally similar'" to the facts at issue in a suit) (citing *Hope,* 536 U.S. at 741).  Absent a four-corner case, the question is still whether, at the time of the encounter with Rodriguez, "the state of the law . . .

gave [defendants] fair warning that their alleged treatment of [him] was unconstitutional." *Id.* (citing *Hope,* 536 U.S. at 741; *Boyd v. Benton County,* 374 F.3d 773, 781 (9th Cir. 2004) ("In excessive force cases, the inquiry remains whether, 'under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable.'") (alteration in original) (quoting *Drummond,* 343 F.3d at 1060)).

In one such closely analogous case, from 2007, the Ninth Circuit held that there was a triable issue as to whether numerous police officers' use of two types of force – "gang tackling" and punching – against a passively resistant suspect while effectuating his arrest for a minor, nonviolent crime, was excessive force. *Blankenhorn,* 485 F.3d at 480-81.  Notwithstanding the suspect's refusal to kneel down, the Court found that a rational jury "could conclude that the gang tackle was unreasonable under the circumstances. *Id.*  In determining whether the rights at issue were clearly established at the time of the underlying incident, the Court looked to *Graham*, from 1989, reasoning that:

> we need look no further than *Graham*'s holding that force is only justified when there is a need for force. We conclude that this clear principle would have put a prudent officer on notice that gang-tackling without first attempting a less violent means of arresting a relatively calm trespass suspect—especially one who had been cooperative in the past and was at the moment not actively resisting arrest—was a violation of that person's Fourth Amendment rights. This same principle would also adequately put a reasonable officer on notice that punching [plaintiff] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was also a Fourth Amendment violation.

*Id.* at 481 (citing *Graham*, 490 U.S. at 396).

Finally, in addition to *Blankenhorn* and *Graham*, *Headwaters II*, also based on Fourth Amendment principles, would have provided a reasonable officer in the Defendant Officers' position with notice that a group of police officers' use of cumulative, intermediate force would constitute excessive force. 276 F.3d at 1131 (finding that police officers employ excessive force when using baton blows in tandem with pepper spray upon an individual who is engaged in the commission of a nonviolent misdemeanor, and who is disobeying a police officer's order, but otherwise poses no threat).  Although the specific facts of the instant case may be different, because

41

a group of officers in this case used multiple types of intermediate force in tandem, *Headwaters II* would explicitly put officers in the Defendant Officers' position on notice that "the use of intermediate force in general" would constitute an excessive response to a suspect's commission of a misdemeanor and disobedience of a police order. *See e.g. Young*, 655 F.3d at 1168 (citing *Hope*, 536 U.S. at 741 (holding that factually identical precedents are not required for law to be clearly established for qualified immunity purposes)).

That these cases do not specifically include Tasers in the variations of combined application of significant force by a group of officers is of no mind, because "they need not." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 1292 (2014).  Common sense suggests, and case law supports, that "the use of a taser can in some instances constitute excessive force." *Id.* (collecting cases).  It logically follows from clearly established case law which explicitly put Defendants on notice that a group of police officers cannot constitutionally use multiple types of significant force in concert (like a combination of pepper spray plus baton strikes), upon a nonviolent, albeit belligerent, passively resistant noncompliant misdemeanor suspect, that these same cases also put Defendants on notice that a group of police officers cannot constitutionally use a combination of multiple Taser applications, plus baton strikes, plus a K9 attack against such a suspect, because the clear principle is fundamentally similar, if not exactly the same. *See Hope,* 536 U.S. at 741 (in novel circumstances, officials can be on notice that their conduct is violative, even without fundamental similarity to the facts at issue); *see also Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir. 1994) ("[N]o particularized case law is necessary for a deputy to know that excessive force has been used . . .").  It is enough that the necessary relevant principle is clearly established in case law and the instant facts are "not distinguishable in a fair way from the facts presented in the case at hand such that their results should be different." *Headwaters II*, 276 F.3d at 1131 (quoting *Saucier,* 121 S.Ct. at 2157) (internal quations omitted).

The Court concludes that *Graham* (1989), *Smith* (2005), *Headwaters II* (2002), and *Blankenhorn* (2007)*,* illustrate that clearly established case law existed long before the incident in 2009 that put Defendant Officers on notice that a group of police officers could not constitutionally approach a passively resistant, nonviolent suspect in a minor crime, such as Rodriguez, and, acting

1    in concert, nearly or actually simultaneously strike him with a baton as they repeatedly tase him,

2    then attack him with a police dog, all without warning, because such a suspect has a right to be free

3    from the application of non-trivial force for engaging in mere passive resistance. *See Gravelet-*

4    *Blondin v. Shelton,* 728 F.3d 1086, 1093 (9th Cir. 2013) (citing *Nelson,* 685 F.3d at 881 (same));

5    *Blankenhorn,* 485 F.3d at 481 (it was a clearly established principle prior to February 2009 that

6    "force is only justified when there is a need for force.") (citing *Graham,* 490 U.S. 386).

7        Finally, to the extent that Officer Murphy's release of the K9 to attack Rodriguez, which

8    resulted in its prolonged "mauling" of Rodriguez's leg, did not coincide with the two other officers'

9    different but overlapping uses of force, there is no question that, prior to February 2009, clearly

10   established case law existed about the unconstitutionality of such force against a passive,

11   nonviolent suspect in a minor crime.  If the facts as alleged are proven at trial, a juror "could

12   reasonably conclude that the deployment of [a trained police dog] violated clearly established law."

13   *Kyles,* 2014 WL 5524256 at *14 (citing *Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th

14   Cir. 1998) (holding that in 1998 the law was "clearly established that excessive duration of [a

15   police dog] bite and improper encouragement of a continuation of the attack by officers could

16   constitute excessive force")); *see also Chew*, 27 F.3d 1432.

17   **III.    Whether Plaintiffs' Claims Are Barred under *Heck***

18       In Defendants' opposition to the instant motion, they again argue that under *Heck v.*

19   *Humphrey,* 512 U.S. 477 (1994), Plaintiffs' convictions for violations of section 148(a)(1) preclude

20   Plaintiffs' claims.  On remand, the Ninth Circuit specifically found:

21       *Heck* is not the death knell of Plaintiffs' § 1983 excessive force claims, however. Plaintiffs
         may, consistent with *Heck,* pursue claims that the arresting officers used excessive force
22       subsequent to Plaintiffs' unlawful resistance, delay, or obstruction, such as a claim of post-
         arrest excessive force, *see Sanford v. Motts,* 258 F.3d 1117, 1119-20 (9th Cir. 2001), or a
23       claim that, though having a right to use reasonable force based on Plaintiffs' § 148(a)(1)
         violations, the arresting officers responded with excessive force, *see Hooper,* 629 F.3d at
24       1133; *Yount,* 76 Cal.Rptr.3d 787, 183 P.3d at 481-82.

25

26   *See Rodriguez v. City of Modesto*, 535 F. App'x 643, 645 (9th Cir. 2013).  Subsequently, in an

27   Order rendered December 9, 2013 (Doc. 46), this Court addressed this issue at length, specifically

28   finding that Plaintiffs' claims based on the allegations in the SAC are not barred under *Heck*

because the claims do not necessarily arise from the same phase of the encounter with police officers as the behavior which compelled the convictions and thus do not threaten the validity of the convictions. *See Hooper v. Cnty. of San Diego*, 629 F.3d 1127, 1134 (9th Cir. 2011).  The Court declines to relitigate this issue.

## IV.   CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Partial Summary Judgment as to Liability for Violation of Civil Rights and Battery (Doc. 63) is **DENIED**.

Because the unlawfulness of Officer Fontes's first use of the Taser in "probe" mode was not clearly established at the time of the conduct, he is entitled to qualified immunity for such conduct. In all other respects, the Court **DENIES** the Defendants' assertion that officers are entitled to qualified immunity as a matter of law.  The Court's denial is without prejudice, pending potential post trial motions, depending on factual findings by the jury.

IT IS SO ORDERED.

Dated:   **April 8, 2015**                          **/s/ Lawrence J. O'Neill**
                                                    UNITED STATES DISTRICT JUDGE